IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


HUDDLESTON V. HUDDLESTON


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


ANNE MARIE HUDDLESTON, NOW KNOWN AS ANNE MARIE CUDABACK, APPELLANT,

V.

ROBERT MICHAEL HUDDLESTON, APPELLEE.


Filed April 28, 2020.    No. A-19-874.


Appeal from the District Court for Buffalo County: JOHN H. MARSH, Judge. Affirmed.

Lindsay Belmont, of Koenig Dunne, P.C., L.L.O., for appellant.

Bradley D. Holbrook and Elizabeth J. Klingelhoefer, of Jacobsen, Orr, Lindstrom & Holbrook, P.C., L.L.O., for appellee.


MOORE, Chief Judge, and RIEDMANN and WELCH, Judges.

WELCH, Judge.

## I. INTRODUCTION

Anne Marie Huddleston, now known as Anne Marie Cudaback, appeals the order of the Buffalo County District Court modifying the awards of custody, visitation, and child support. For the reasons set forth herein, we affirm.

## II. STATEMENT OF FACTS

### 1. PREVIOUS PROCEEDINGS

In December 2014, the district court entered a dissolution decree, as modified by a subsequent journal entry, dissolving Anne and Robert Michael Huddleston's marriage, awarded the parties joint legal custody of their two minor children Noah and Erin, and provided that Anne was to be the sole determiner of any appropriate medical care necessary for Erin. Primary physical

- 1 -

custody of Noah was awarded to Robert and primary physical custody of Erin, who has cystic fibrosis, was awarded to Anne. Noah has since reached the age of majority leaving Erin as the parties' only minor child. At the time of the dissolution, both parties resided in Kearney, Nebraska.

In February 2015, Anne advised Robert of her intention to move with Erin from Kearney to Omaha, Nebraska. Despite Robert's objections, Anne and Erin moved to Omaha at the end of the 2014-15 school year. Robert filed a complaint to modify the parties' dissolution decree seeking primary physical custody of Erin or, in the alternative, a modification of the parties' parenting schedule. Robert argued that moving Erin to Omaha was subject to his consent as joint legal custodian, that the move constituted a material change in circumstances, and that the move was not in Erin's best interests which he believed was Erin residing with him. In November, the court denied Robert's complaint for modification of custody finding that

> the parent with sole physical custody of a child has the authority to move the child within the State of Nebraska without the consent of the other parent or consent of the court. The courts have also found that the change in the residential location is not in [and] of itself a material change in circumstances requiring relitigation of custody. Rather, it appears that a substantial relocation away from one parent justifies reconsideration and perhaps modification of the parenting time award. See[,] for example[,] [*Bohnet v. Bohnet*], 22 Neb. App. 846[, 862 N.W.2d 99] (2015)[,] in which the Nebraska Court of Appeals found that the custodial parent moving 148 miles away from the other parent did not constitute a material change of circumstances to modify custody, but only visitation and parenting time.

The court also modified the parties' parenting time schedule awarding Robert with parenting time every other weekend, alternating holidays, and the first half of the summer.

## 2. CURRENT PROCEEDINGS

In March 2018, Robert filed another complaint for modification alleging a material change in circumstances including that Erin, being of sufficient age and maturity, had expressed a preference to reside with Robert, Erin's counselor was supportive of Erin's stated preference, and that modification was in Erin's best interests.

On May 11, 2018, Anne filed a motion for change of venue seeking to move the docket to the Douglas County District Court. In support of this motion, Anne alleged that she and Erin moved from Kearney to Omaha at the end of the 2014-15 school year and have resided in Omaha for nearly 3 years; that in November 2017, the court entered a journal entry modifying the parties' 2014 dissolution decree "regarding parenting matters including but not limited to [Robert]'s routine and holiday parenting time, provisions for parental contact with the minor child, transportation, name on child's official records, emergency medical decisions, scheduling of activities, the minor child residing in Nebraska, and mediation for conflicts prior to seeking judicial intervention"; the minor child attends school in Omaha, receives medical treatment in Omaha, and her medical providers are located in Omaha; and Robert is seeking a review of custody of the minor child which would require testimony from the minor child's medical care team in Omaha. She alleged that the Douglas County District Court was the more convenient venue for this matter. On May 22, a hearing was held on the motion to change venue and the court received an affidavit

by Anne into evidence; however, this hearing and exhibit are not included in our record. On May 24, the district court overruled Anne's motion to change venue.

Following a trial progression conference held in mid-May 2018, on May 17, the district court ordered that discovery was to be completed, and the parties were to exchange witness and exhibit lists, 30 days prior to trial which was scheduled for August 7.

On July 2, 2018, Anne's first counsel filed a motion to withdraw for the reason that Anne had obtained different counsel. The following day, July 3, the district court granted Anne's first counsel's leave to withdraw and Anne's new counsel filed an entry of appearance. Also on July 3, Anne's new counsel filed a motion to continue the trial set for August 7 because counsel would "be outside of the State of Nebraska from August 1, 2018[,] through August 10, 2018, and is not available for trial on August 7, 2018." The motion to continue the trial also alleged that new counsel required time to complete discovery and that counsel would be available for trial by October 1 which trial date was available. Finally, new counsel requested leave of the court to file a responsive pleading out of time. Counsel also filed an affidavit in support of the motion to continue. The hearing on the motion to continue and request to file a responsive pleading out of time was heard telephonically by the district court on July 17. Also on July 17, Robert's counsel traveled from Kearney to Omaha for the noticed deposition of Stephanie Huckins, Erin's counselor. Moments before the deposition was noticed to occur, Anne's counsel advised Robert's counsel that she was not attending the deposition and would be withdrawing as Anne's counsel of record. Neither Anne nor her counsel attended Huckins' deposition.

On July 26, 2018, the district court granted Anne's motion to file her responsive pleading out of time, but denied her motion to continue the trial noting that Anne's prior counsel

> acknowledged to the Court at the time of the progression conference on May 14, 2018, that trial in the matter should be concluded prior to school resuming for the Fall 2018 semester. The Court now finds that [Anne] has changed counsel, who is not available for trial. However, the Court finds that the prejudice to [Robert] in continuing the trial exceeds that of [Anne] choosing new counsel.

On July 27, 2018, Anne filed an answer and counterclaim denying Robert's allegations that a material change in circumstances had occurred, denying that a change in custody was in Erin's best interests, requesting a modification of child support, and an award of attorney fees.

On August 1, 2018, Anne filed a motion to continue the trial on the basis that the discovery process was not complete; that, during a July 17 telephonic hearing on her motion to continue the trial, counsel learned of Robert's intention to use the transcript of Huckins' deposition, whose deposition was set for that afternoon, in lieu of live testimony; counsel notified the court and defense counsel that she would not be appearing at Huckins' deposition on July 17 due to the improper notice of a deposition in lieu of live testimony and consequently, Anne was unrepresented at the deposition; and a continuance was necessary in order for Anne's counsel to conduct her own discovery of Huckins. Robert's counsel objected to the motion to continue; however, on August 3, he filed a motion to amend his complaint to request that, should Robert be awarded primary physical custody of Erin, that the court also order that he be the sole determiner of any appropriate medical care necessary for Erin.

Following the filing of Robert's motion to amend his complaint, Anne filed an amended motion for the continuance of the trial, and affidavit in support thereof, adding the allegation that Robert filed a motion to amend his complaint on August 3, 2018; she was allowed 30 days, pursuant to court rules, to file an answer; and if Robert was allowed to amend his complaint and a continuance was not granted, Anne would be deprived of her right to answer Robert's amended allegations. Robert withdrew his motion to amend his complaint so that the parties could proceed to trial as scheduled on August 7.

## 3. TRIAL

The trial began as scheduled on August 7, 2018. Witnesses at trial included Robert, Anne, and two of their adult children, Lucas Huddleston and Bridget Huddleston. Erin testified in camera with the attorneys, but not her parents, present.

### (a) Parties' New Relationships and Employment

At the time of the modification hearing, both Robert and Anne had remarried. In July 2018, Robert married Kathy who was Erin's former dance instructor in Kearney. When Erin is in Kearney, she lives with Robert, her stepmother, Kathy, and her stepbrother, Zane. Erin had been involved in dance classes and competitive dance from the time she was approximately 5 years old, which is how Erin came to know Kathy, who was the owner of the dance studio. Anne married Michael Cudaback in August 2016. When Erin is in Omaha, she lives with Anne and Michael. Anne describes herself, Michael, and Erin as "a normal family."

At the time of the hearing, Robert was employed as a loan officer at a bank in Kearney earning $100,000 annually plus benefits including health, dental, and vision insurance, and a 401K. His normal working hours are Monday through Friday from 8 a.m. to 5 p.m. Anne was previously employed full time in the IT field earning $60,000 plus benefits. Anne chose to stop working full time in March 2017 in order to spend more time with Erin, manage Erin's health, attend more of Erin's activities, volunteer at Erin's school and at church, and transport Erin to and from her activities and appointments. At the time of the hearing, Anne was employed part time, earning $13 per hour as a compassionate caregiver providing nonmedically related support to people. Anne also receives about $12,000 annually in rental income from a condo that she purchased in 2015. The condo has no mortgage, the real estate taxes are approximately $2,800 per year, and insurance expenses are generally $450 per year. Anne also receives an undetermined amount of interest income or dividends from funds that she has invested in an investment account.

Robert described Erin as "a good student" who is "very laid back," "responsible," "very mature for her age," "somewhat of a people pleaser," and someone who is "going to get along . . . with whoever in pretty much whatever situation she gets put into." Anne described Erin as "mature," loving, and well-adjusted child with "a wonderful, energetic, outgoing, extroverted personality" who makes friends easily.

### (b) Activities Before and After Move to Omaha

Prior to moving to Omaha in May 2015, Erin was engaged in the church in Kearney and she was active in volleyball, basketball, and dance.

After moving to Omaha, Erin began attending Christ the King school. Anne testified that Christ the King is "a very good school" and Erin gets "excellent grades." Robert admitted that he did not have any complaints about Christ the King school; that he was satisfied with the education Erin was receiving; and he acknowledged that Erin gets good grades.

According to Anne, Erin has been "thriving" since the move to Omaha and "made friends literally days after we got to Omaha. She's got friends in the neighborhood, she has friends at school, she's acclimated at school, she loves her school. She's engaged in all of the activities that the school provides." Anne further testified that Erin has "a ton of friends" who are "supportive," "active," and they all "get along great" and Erin and her friends do things like go to the movies, walk to Starbucks or the Village Grinder, ride bicycles, go swimming, hang out, play sports, and work on school activities. Anne testified that she and Erin go shopping, attend sporting events including Creighton basketball and volleyball games, go out to dinner, attend Erin's sporting events, volunteer, and attend church activities.

Robert admitted that Erin had not complained to him about being unhappy in Omaha and that Erin has friends; is involved in the community; is involved in activities such as dance, and in sports such as volleyball and basketball; and that Erin's Omaha dance studio was a "good dance studio" but noted that Erin does not dance competitively in Omaha. Anne testified that Erin does not participate in competitive dance in Omaha because Robert would not support it because it would involve taking parenting time away from him for extra practices on Saturday mornings.

(c) Health Issues

Erin has cystic fibrosis which Anne described as "a genetic disease" which causes the body to produce "too much mucous . . . so it can affect any organ in the body, but it mainly affects the lungs and the pancreas." According to Anne, this mucous buildup "can lead to frequent lung infections," and affects the pancreas requiring an individual with cystic fibrosis to take enzymes "every time they eat to be able to digest their food." Anne further testified that individuals with cystic fibrosis also have issues with their sinuses due to mucous buildup and that Erin has had multiple sinus surgeries, digestive issues, and "a couple of [peripherally inserted central catheter] lines." Erin's daily treatment for her cystic fibrosis includes breathing treatments, saline nasal rinses, chest percussion treatments, aerosolized antibiotics, and oral medications. Erin takes close to 50 pills per day including the enzymes she takes every time she eats.

Erin has doctored for her cystic fibrosis in Omaha for her entire life and, even when she lived in Kearney, Erin's parents were able to manage her appointments and medical claims from Kearney. However, Anne testified that sometimes pharmacies in Kearney did not have the medications that Erin needed: this issue does not arise with Omaha pharmacies. Anne also testified that, in her opinion, the medical providers in Kearney are not comparable to the medical providers in Omaha, which includes the only accredited cystic fibrosis center in the region. Erin has quarterly checkups with a pulmonologist in Omaha and her doctors at the cystic fibrosis center at the University of Nebraska Medical Center which also has respiratory therapists, nurses, a social worker, a psychologist, and a dietician. Erin has also participated in clinical trials which take place in Omaha. Erin also has an ear, nose, and throat doctor who specializes in cystic fibrosis, as well as appointments with her vision provider, dentist, and therapist.

Anne testified that being in Omaha is beneficial because "We're also just minutes away from her healthcare, so if any problems arise, I'm able to just call them and run her over there without much disruption in any of her activities or her [school day]." Robert testified that there would be no impediment in Erin's medical treatment if she lived in Kearney, that there are dentists and eye doctors in Kearney, and Erin's Omaha appointments could be scheduled on the same day to reduce the amount of time that Erin would miss school.

Anne does not consider Erin to be autonomous when it comes to her medication and healthcare management because

> she's a 13-year-old, so she's a teenager, so she can do her treatments on her own, she can, you know, do all of that, but she needs her mom and her dad when she's with her dad to remind her and urge her sometimes, you know, because life is busy, she's a busy person, she does not sit around. So if she's on the go, she would just as soon skip her treatment or skip her meds and go. But somebody needs to be there to make sure it gets done.

Similarly, Robert testified that, although Erin is becoming more self-sufficient in managing her health and her treatments, she still needs reminders sometimes to take her medications or assistance with having her pills set out for her.

Anne estimates that she spends approximately 15 hours per week managing Erin's cystic fibrosis needs including completing Erin's healthcare paperwork; filing insurance claims; scheduling doctors' appointments; assisting with the administration of medications; and ordering medications and refills which come from four different pharmacies--mail order, specialty pharmacies, and a cystic fibrosis-affiliated pharmacy. Anne testified that, in her opinion, a parent who has a child with cystic fibrosis needs to be flexible in his or her schedule, she is able to be flexible in her schedule, and Robert does not have the same level of flexibility due to his job. Although Robert acknowledged that Anne spends nearly 15 hours per week handling Erin's medical needs including filing insurance claims, ordering prescription medication from multiple pharmacies, and scheduling doctors' appointments, Robert testified that he has the same amount of time as Anne to devote to Erin's medical care. He further testified that, despite his more rigid work schedule, he did not have any concerns about being able to get time off from work when Erin needed to attend doctors' appointments in Omaha.

### (d) Robert Huddleston

Robert testified that he did not think that Anne is an unfit parent, that he believes that Anne "is a good mother," but that he is "calmer, easier to talk to [as a] parent, and that Anne is maybe a little more emotional parent." He further testified that although he thinks that Anne is, at times, easy to anger, "we all get angry," and acknowledged that it is reasonable for a parent to get angry sometimes.

Robert described his relationship with Erin as a "very close father-daughter relationship." When Erin is in Omaha, Robert tries to talk to her every day either by telephone or FaceTime. He stated that Erin is "very open" with him, he tries to be very open with her, and he stated that "I think she feels like she can come to me with anything, and . . . I try to listen and . . . give my best parenting advice. So we get along very well." Robert admitted that he "kept [Erin] in the loop"

about the court proceedings despite the fact that this was contrary to the recommendations from Erin's therapist.

Robert testified that, within 12 months of moving to Omaha, Erin came to him and expressed that she wanted to live with him in Kearney and go to Kearney Catholic like her siblings had done. Robert stated that he wants Erin to go to Kearney Catholic but that Kearney Catholic and Christ the King are "equally good schools." Robert stated that it was best for Erin to live with him in Kearney because:

I'm stable in Kearney, I've lived here for quite some time, I've worked in the business community in Kearney for quite some time. Erin and I have a great relationship. Obviously, she's my child, so I love her and I want to be around her as much as I can, participate in her activities. I think there [are] great activities for her to be involved in Kearney, very respectable dance programs and teams that she can be on.

Obviously, I think we all believe Kearney is a great town to live in and raise a family. The remainder of my children live here. So that's a great asset. I mean they can be a part of the family and part of Erin's life and they can go to Erin's activities and Erin can see her . . . nieces and nephew, as much as she can. I mean they live fairly close and so there is just a good family atmosphere, close knit family, a lot of friends, a lot of support here in Kearney.

Finally, if the court were to modify custody, Robert suggested that visitation remain the same, just in reverse, with the exception that the Friday night visitation begin at 6:30 p.m. rather than 7 p.m. Robert testified that the parties had been following the 6:30 p.m. exchange time because Anne had contacted him about meeting earlier than 7 p.m. and 6:30 p.m. was the earliest he could be at the York meeting location after leaving work at 5 p.m.

(e) Anne Huddleston

Anne acknowledged that Robert was "a good father and a good parent" but she felt that he did "not [have] any rules" and that he was not as "vigilant" as she was. Anne stated that she has an "awesome" relationship with Erin but acknowledged that Erin has an equally good relationship with Robert and that he loves Erin unconditionally just as she does. However, she feels that Robert is controlling and that

[i]f a person is controlling every situation, then they are never going to enable that child to grow and be able to be accountable and self-sufficient and mature correctly. I just feel like it's really important to foster that environment where they have to be accountable. And if you have a situation that you made a bad choice, you have to have a situation that corrects that or, you know, makes you understand accountability, makes you understand respect.

Anne testified that when Erin returns from parenting time in Kearney, Anne observes that Erin is more disrespectful. Anne testified that she "think[s] it's hard to go from . . . a certain environment to the other. I think that for any child it would be challenging. I feel like she's more free to be herself around us because I don't have huge expectations. Like I just let her . . . transition, basically, if that makes any sense. I mean I just don't want anything to be hard on her, so I just kind of let it be." Anne further testified that it is important for her to instill respect in Erin and

when Erin is disrespectful, Anne gives Erin a consequence such as taking her phone away or having her write a paragraph on what respect means to her or how she could have approached the situation better and then discussing the situation with Erin.

Anne described her greatest strengths as Erin's mother as being there to nurture her, wanting the best for her, and that she would do anything to make Erin happy. Anne described her parenting style as being

like any other mom, I want to make sure that I'm doing the best and enabling [Erin] to be the best person she can be. I'm very vigilant about her treatment, about her maintenance, about her doctor's appointments, making sure that she had the best possible foundation that I can help her get, you know, as she grows, not only, like emotionally, but with having a disease. I mean it's -- it's definitely not something that you -- I just -- I just want the best for her.

Anne testified that she does not believe that it is in Erin's best interests to live in Kearney because it is in Erin's best interests "to be with her mother," and Erin "is so engaged and so happy in all of the things she does in Omaha, she's so engaged in her church and her confirmation class, she loves her teachers, she loves our dog." Anne further testified that Erin is active, has friends, has numerous activities, and is close to her doctors. Anne further opined that it was in Erin's best interests to remain at Christ the King school and, given Erin's age and grade in school, it would be disruptive for her to change schools because

she's so acclimated. She's looking forward to going, we've bought her uniform, she's got her new shoes. She's all lined up. She has her school supplies. She's talking -- just yesterday she was talking about eighth grade graduation and making plans for that.

Typically, when the kids graduate from eighth grade at Christ the King they don't have a school-sponsored trip to Washington DC, but there are -- it's like a parent-sponsored trip, so there is always a group of 10 to 15 kids that go out of the eighth grade class to Washington [D.C.] So she's planning for that next summer and really wanting to participate in that.

She's excited for volleyball to get started . . . Well, she's not excited to study, I'll put it that way because she's, you know, a 13-year-old. But I think she's excited to get back and see all of her friends that she hasn't seen over the summer.

Even though Erin told her during a counseling session in January 2018 that she would like to live in Kearney, Anne did not believe that this reflected Erin's true feelings

[b]ecause she's invested so much in her community and her relationships and her school. She even . . . has me go to bat for her in trying to negotiate parenting time once in a while. And so I found it kind of funny that right when I was made aware of this that just like a week earlier, she had wanted to come back from her parenting time in Kearney earlier to spend time with her friends because they were planning some big sleepover, and she didn't want to miss out.

So I know in my heart that that's what she wants. I just -- I mean she, she just wants to be a kid and do what kids do. I mean we're planning, she's planning a huge sleepover quick before school starts, starting tomorrow. We have three days of constant activities and

two nights of sleepovers at different people's houses. And so I mean she just wants to be a kid and be herself. She's a beautiful child. I don't know why she can't just be herself.

In Anne's opinion, the parties' current parenting time schedule should not be modified. The current parenting schedule observed by the parties is that Erin is in Kearney every other weekend, every spring break and fall break, and uninterrupted time from the time school gets out until the end of June. Additionally, Anne and Robert split holidays. Anne further testified that she believed that it was in Erin's best interests that she maintain decisionmaking authority over Erin's medical care.

Anne sought attorney fees and testified that she had spent nearly $18,000 in attorney fees and requested that the court order Robert to contribute $7,500 toward her attorney fees.

### (f) Lucas Huddleston

Lucas, the parties' 27-year-old son, testified that he moved back to Kearney in May 2018 following his discharge from the military. He currently lives in Kearney with his wife and three children ages 4 years old, 2 years old, and 2 months old. Lucas testified that he has almost daily contact with Robert and talks to Anne on the phone about one to two times per week. He classified his relationship with both parents as "good" and that both parents have been "great parent[s]"; however, he stated that he tries to emulate Robert as a dad.

Lucas testified that since he moved back to Kearney, he has seen Robert and Erin together and stated that it appeared that they have a "good" relationship, they appear to be open and honest with each other, and that Robert appears to be vested in Erin's best interests. He further testified that, in his opinion, Erin seems older than her actual age of thirteen, "just in the way she carries herself and the way she talks to us." He further acknowledged that Erin is "respectful" and that, on multiple occasions, she expressed the preference of living with Robert. Lucas further expressed that he did not have any concerns with either Robert or Anne's ability to manage Erin's cystic fibrosis.

### (g) Bridget Huddleston

Bridget, the parties' 23-year-old daughter, who, like Erin, also has cystic fibrosis, testified that she lives in Kearney and works as a respiratory therapist. Bridget described Robert's parenting style as "very calm and very patient," that he "knows how to discipline when it's necessary, but he's always supportive, wants what's best for you, [and] gives you great advice." Bridget described Anne as "very naggy" and that her relationship with Anne was not as good because she felt as if her "self-esteem was being torn down on a daily basis." However, later in her testimony Bridget admitted that examples of Anne's "nagging" were when Anne told her to take dishes to the sink or to take her medication. Bridget also admitted that, when she had an overnight hospital stay, Anne stayed the night with her and that she requested Anne's help in refilling her medications the Friday before trial. Bridget also admitted that Anne pays her health insurance premiums and that she is grateful for this.

Bridget testified that she attended school in Omaha from November 2015 until May 2017 and, during that time, she had the opportunity to observe Anne and Erin's interactions approximately twice per week. During that time period, Erin confided that she was upset with

Anne, in how Erin was treated by Anne, and Erin's concerns about her relationship with Anne. Bridget stated that almost immediately after Erin moved to Omaha, she and Erin had conversations about Erin wanting to move back to Kearney. Bridget also described Erin as "very mature" and stated that "Erin is not a follower. . . . She leads and does. If she doesn't want to do something that other kids are doing, Erin is going the different way. She's like, I'm not going to do that. She knows more things than I ever knew at that age." Bridget further testified that she feels that she has a responsibility to be a role model for Erin; however, she acknowledged having given Erin alcohol.

(h) Testimony by Erin Huddleston

The district court conducted an examination of Erin with attorneys, but not her parents, present.

Erin testified that she has lived in Omaha for 3 years. In Omaha, Erin lives with Anne and Michael. She stated that, at first, Michael was "very short-tempered," but now "I talk to him and he's nice and we have good talks. But I don't talk to him as often as I talk to Kathy[.]" At the time of the hearing, she was attending Christ the King school and was active in extracurricular activities including school and club volleyball, school basketball, and dance. If Erin remained in Omaha, she was considering attending Marian High School.

Erin testifies that she has known her stepmother, Kathy, "[s]ince I was probably a baby" and she and Kathy "get along very well. She's very kind and very laid back." She also stated that Zane is "hilarious" and she "like[s] being the older one in the situation . . . because . . . I don't boss him around . . . I like having a little brother, I guess. . . . I like to play outside with him and jump on the tramp[oline] and that kind of stuff." During her 6-week summer visitation with Robert in Kearney, Erin participated in a volleyball camp and a basketball camp at Kearney Catholic, she "helped out around the house a lot," and helped at the Dance Works studio. Robert reminded her to take her medications and sometimes reminded her to do her evening percussion treatments. Erin stated that, when she is in Kearney, Anne talks to her "all the time and we Facetimed" once or twice per week.

Erin testified that she has been seeing a counselor, Stephanie Huckins, since right after she moved to Omaha. She stated that she did not find it helpful at first, but after she had been living in Omaha longer, she found it very helpful.

She stated that she has been talking about wanting to move to Kearney for about 2 years. Erin explained that Bridget and Anne had gotten into a fight and she "didn't agree with it." Later when she had dinner with Robert, he asked her "someday when you turn 13, do you want to come to Kearney and I said yes. And that's kind [o]f how it started." Erin explained that "[the significance of that age was] I think it was that age when he thought that I could talk to the judge personally, and he felt that it was good for me at this age, as I'm starting to mature more." Erin also stated that she has told Anne several times that she wanted to live in Kearney: in counseling, at home, and on the way to parenting time exchange. Anne was "kind of quiet and she just said ok" but after she "kind of had . . . a little snotty attitude about it . . . she thought her way was the right way."

Erin testified that she has cystic fibrosis which requires quarterly doctor's appointments in Omaha which she has been attending since she was an infant. She also has to take pills four times

per day and has breathing treatments two times per day for 30 minutes each session. She admitted that she is not always compliant with her medications or her routine of breathing treatments, so she "like[s] that reminding" from her parents to take her medication or to complete her breathing treatments. Erin stated that the way her parents remind her to do things differs: Anne "is very, like get this done now, you got to do it now. She's very strict with what she does. And she pounds things into you, but my dad is very relaxing and he helps you with it and he . . . [lets] you know what you are doing and how to do it and is very calm with it." Erin testified that Robert's way "is more effective because it helps me learn better of what to do, when to do it, everything like that."

Erin testified that, after thinking about the matter for 2 years, she wants to live in Kearney with Robert

> [b]ecause I want to go to Kearney Catholic and go where all my siblings went. I want to live closer to my siblings because they all live in Kearney. And at my dad's house it's more settled and a family style because I have my stepbrother, who is basically a brother to me, and then I have my stepmom. And we're very active and we like to go out and do things, go for runs, go for bike rides, play in the neighborhood, do a lot of stuff. And it's more settled and my dad is more calm . . . .

Erin testified that, if she lived in Kearney, her time with Anne would look like the following:

> I would like to go out every other weekend and spend as much time with her. I don't want to totally cut it and just forget about her, you know. I still want to spend time with her, I still love her equally, and I want to get as much time with her as I can, you know, with school and stuff, like summer break. Just basically the opposite of what I have with my dad right now, just switch.

Erin also testified that Omaha is

> really big and I don't like that big feel like with dance and everything. I just don't like that. I like a small town feel. And Omaha to me is -- I think Kearney is more safe than Omaha because I was walking home from school one day . . . in my . . . school uniform, and a high schooler yelled out the window to me something very inappropriate. And I took that really offensively. And that just made me feel like insecure about myself, and so that's why I like a safe environment.

She also testified that "I know that I love living in Kearney with my dad and I feel Kearney is a safer environment and I want to go to Kearney Catholic."

(i) Stephanie Huckins' Deposition Testimony

Stephanie Huckins' deposition testimony was offered into evidence by Robert and was received by the court over Anne's hearsay objection and objection that the deponent was not unavailable as defined by Neb. Rev. Stat. § 27-804 (Reissue 2016).

Huckins' testimony, as set forth in her deposition, established that she is a licensed clinical social worker, licensed independent mental health practitioner, and registered play therapist. Huckins began seeing Erin in a professional capacity in June 2015 in order to help Erin cope with her feelings regarding her parents' divorce and her move to Omaha with Anne. Huckins' entire

counseling file was attached to the deposition as an exhibit. Huckins specifically noted that she did not complete a parenting assessment and was neutral regarding any recommendation about which parent should be awarded physical custody of Erin.

Huckins characterized Erin as a "pleasant," "easygoing," "very mature," "well mannered . . . people pleaser [who] wants to make others happy. I think she's more likely to go along with things to make other people happy rather than assert herself and her wishes." She also described Erin as engaged, honest, and open. Huckins and Erin worked on coping skills to deal with anxiety including identifying thoughts and feelings and practicing relaxation skills.

Near the end of 2017 and the beginning of 2018, Erin expressed her desire to move back to Kearney to live with Robert and attend the school that her siblings had attended. Huckins testified that she believed that this was what Erin wanted but she thought it was "interesting" that Robert told Erin that she needed to come back to therapy and tell Huckins that was what she wanted and Huckins did not find Robert's response to be an appropriate response from a parent. Huckins explained that if Erin had gone to Robert and expressed that she wanted to live with him, it would have made sense to her that he would have said something like "Talk it over with your therapist to see if this is something you're really interested in." Another "red flag" for Huckins was that Erin stated that "because she was going to be 13, that now was the time." Huckins' testified that her report set forth that Erin stated that Robert "said [Erin] should come back to therapy as she will be 13 years old in December and [Robert] will be going back to court for custody." Huckins testified that Robert expressed that he did not want to push Erin into moving to Kearney or pursue it if it was not something that would be good for Erin. Huckins' therapy notes stated that Erin related to Huckins that Robert told her that if moving to Kearney was something that Erin did not really want, then Robert would not pursue going to court. Huckins stated that Anne expressed concern that Robert was manipulating Erin and that Erin wanting to move was not Erin's true feelings. During one of her sessions with Erin, Huckins talked with Erin about the pros and cons of staying in Omaha or moving to Kearney and she felt that Erin was open and honest about the reasons that she provided. Erin's reasons for liking Kearney better included:

Omaha feels rushed and Kearney feels more laid back; there are stricter rules in Omaha and [she] knows [Robert] will have rules too. Erin expressed plans to come back and see friends and go to games. Processed the two homes being different and it is really more about the homes than the communities. Processed different parenting in that [Anne] does not give her time and [Anne's] attitude (she is always right, does not listen to [Erin's] ideas; and does not realize [Erin] is mature and knows things including how [Anne] has treated others). Expressed that [Robert] is more laid back and will listen and understand. Erin expressed that she has been thinking about this for a couple of years. Erin stated that the first year she was close to [Anne] and wanted to move back to Kearney, never wanted to live in Omaha.

Erin's written list for staying in Omaha with Anne listed the pros as being close to her doctors, keeping her friends, having more options for high schools, being in club volleyball, being in the same town as her grandma, and having a lot to do. She listed the cons as having a lot of consequences, more fighting, and disagreements at Anne's home; she was not as close to her siblings; and there was more crime in Omaha. Erin listed the pros of living in Kearney with Robert

as less fighting, being closer to her siblings, going to the school where her siblings attended, seeing her old friends, being in a family that communicates more, being in a more family-oriented setting, the family is not as strict, and she feels that she can express her opinion without getting in trouble. She listed the cons as being further from her doctors and further from her current friends. Erin also compared her Omaha and Kearney homes on a scale of one (peaceful) to ten (chaotic) rating her Omaha home being as a six where Anne and Michael were fighting and a three to four when they were not fighting. She rated her Kearney home as a one except when her sister comes over when she rated the home at a two or a three. Huckins expressed that Erin's reasons for wanting to move to Kearney were rational and reasonable for a 13-year-old.

### 4. DISTRICT COURT'S ORDERS

On August 24, 2018, the district court entered the order of modification awarding primary physical custody of Erin to Robert and retaining joint legal custody between Robert and Anne but granting Robert final authority on decisions affecting Erin including medical treatment. The court noted the following: that 13-year-old Erin has positive relationships with both Robert and Anne; that Anne's parenting style is more critical and demanding whereas Robert's parenting style is more relaxed and collaborative; that there is more conflict between Erin and Anne but this is expected to some degree because Erin spends more time with Anne during the school year resulting in more instances where Anne would be the parent demanding compliance with schoolwork and medical treatment; and that both Robert and Anne are good and fit parents. The court noted that both Kearney and Omaha have their respective benefits and drawbacks as do their school systems. The court stated that it "believes that Erin can succeed in either community and at either school."

The court's order further set forth that "Erin acknowledged that [Robert] suggested that 13 was the age when she could express a preference regarding her residence to the judge. Erin clearly expresses a preference to live with [Robert]. Erin wishes to attend Kearney Catholic High School where her siblings attended school and wishes to be close to extended family in the Kearney area." The order further stated that Erin

> [c]learly expresses a preference to reside with [Robert]. [Erin] appears to be a mature 13-year-old. Her stated preference has been expressed for at least several months and does not appear to be impulsive. The Court is concerned that [Robert] may have influenced the child's decision by informing her that she could state a preference to the judge upon reaching the age of 13. The minor's reasons for her preference include returning to her childhood community, attending the school attended by her siblings and being close to extended . . . family. The Court finds these to be sound reasons.

The court acknowledged Erin's health issues and Anne's reservations about Robert's ability to handle those issues; however the court found that Anne's concerns, while understandable, were not supported by the evidence. The court's order further provided:

> The Court is aware that school has started at this point. The parties are ordered to confer regarding the transition from Omaha to Kearney. If the parties are unable to agree [it] is ordered that Erin's residence [is to] be established in Kearney and that she be enrolled in Kearney, within 30 days of this order.

- 13 -

Finally, the court ordered Anne to pay child support of $540 per month, Robert was "ordered to pay the first $480 per month (sic) of all reasonable and necessary medical, dental and orthodontic expense[s] for [Erin]" and each party was ordered to pay their own attorney fees and costs.

Following the entry of the modification order, the court entered an order nunc pro tunc clarifying that Robert was ordered to pay the first $480 per year (not month) of all reasonable and necessary medical, dental, and orthodontic expenses for Erin, and in all other respects, the August 24, 2018, order remained unchanged. Following several appeals which were dismissed for lack of a ruling on a motion for new trial and lack of parenting plan attached to the court's modification order, the court denied the motion for new trial and entered an order stating:

> [I]t was the intention of the Court to follow the wishes of [Robert] that in the event the Court modified primary physical custody, [Anne] would be awarded reciprocal parenting time that [Robert] enjoyed pursuant to the Court's prior Order of November 17, 2015. The Court therefore adopts as [its] Parenting Plan the visitation as previously awarded to Robert and as set forth in the Court's Order of November 17, 2015, which shall be exercised by [Anne].

Anne has now timely appealed to this court.

## III. ASSIGNMENTS OF ERROR

Anne contends that the district court abused its discretion in (1) failing to provide her with an adequate opportunity to prepare for trial, (2) finding that a material change of circumstance occurred warranting a modification of physical custody of the parties' minor child and that modifying custody was in Erin's best interests, (3) modifying final decisionmaking authority regarding the minor child's medical decisions from Anne to Robert, (4) awarding Anne the same amount of parenting time that was previously awarded to Robert, and (5) in denying her request for attorney fees.

## IV. STANDARD OF REVIEW

Modification of a dissolution decree is a matter entrusted to the discretion of the trial court, whose order is reviewed de novo on the record, and which will be affirmed absent an abuse of discretion by the trial court. *VanSkiver v. VanSkiver*, 303 Neb. 664, 930 N.W.2d 569 (2019).

In an action for modification of a marital dissolution decree, the award of attorney fees is discretionary with the trial court, is reviewed de novo on the record, and will be affirmed in the absence of an abuse of discretion. *Garza v. Garza*, 288 Neb. 213, 846 N.W.2d 626 (2014); *Pearrow v. Pearrow*, 27 Neb. App. 209, 928 N.W.2d 430 (2019).

## V. ANALYSIS

### 1. FAILURE TO PROVIDE ADEQUATE OPPORTUNITY TO PREPARE FOR TRIAL

Anne's first assignment of error is that the district court abused its discretion in failing to provide her an adequate opportunity to prepare for trial by (a) denying her motion to change venue from Buffalo County to Douglas County, (b) denying both of her motions for continuance of the trial, and (c) failing to afford Anne's second counsel the opportunity to conduct discovery.

- 14 -

(a) Denial of Motion to Change Venue

Anne claims that the district court's denial of her motion to change venue from Buffalo County to Douglas County prevented her counsel from having an adequate opportunity to fully present her case because Erin's medical team was located in Omaha, Douglas County, and "[Anne]'s defense against [Robert]'s request to modify custody [required] testimony and the availability of Erin's medical care team." Brief for appellant at 25-26.

A motion for change of venue is addressed to the discretion of the trial judge, whose ruling will not be disturbed absent an abuse of discretion. *State v. Erickson*, 281 Neb. 31, 793 N.W.2d 155 (2011); *State v. Pryce*, 25 Neb. App. 792, 913 N.W.2d 755 (2018).

Here, although there was a hearing held on Anne's motion for a change of venue and Anne's affidavit was received at that hearing, the record of the hearing and Anne's affidavit have not been made part of the bill of exceptions before this court. In *T. S. McShane Co., Inc. v. Dominion Constr. Co.*, 203 Neb. 318, 321, 278 N.W.2d 596, 599 (1979), the Nebraska Supreme Court stated:

> In Spidel Farm Supply, Inc. v. Line, 165 Neb. 664, 86 N.W.2d 789 (1957), this court stated: "There is no affidavit preserved or contained in the bill of exceptions in this case. The effect of this omission is that any affidavit considered by the district court is not before and may not be considered by this court. An affidavit used as evidence in the district court cannot be considered on appeal of a cause to this court unless it is offered in evidence in the trial court and preserved in and made a part of the bill of exceptions."

Further, it is the appellant's burden to create a record for the appellate court which supports the errors assigned. *Clarke v. First Nat. Bank of Omaha*, 296 Neb. 632, 895 N.W.2d 284 (2017).

In *State v. White*, 244 Neb. 577, 585, 508 N.W.2d 554, 562-63 (1993), *postconviction relief granted*, 249 Neb. 381, 543 N.W.2d 725 (1996), *overruled on other grounds, State v. Burlison*, 255 Neb. 190, 583 N.W.2d 31 (1998), the Nebraska Supreme Court held that where no evidence is offered to support a motion to change venue, an appellate court is not in a position to review a district court's ruling and thus found that the district court did not abuse its discretion in denying the motion to change venue.

In the absence of a bill of exceptions for the hearing on Anne's motion to change venue and her affidavit which was received into evidence, this court is not in a position to review the district court's ruling. Thus, we find that the district court's decision denying the motion to change venue was not an abuse of discretion.

(b) Denial of Motions to Continue Trial

Anne next contends that the district court erred in denying her motions to continue the trial.

An application for continuance must be in writing and supported by an affidavit which contains factual allegations demonstrating good cause or sufficient reason necessitating postponement of proceedings. *Velehradsky v. Velehradsky*, 13 Neb. App. 27, 688 N.W.2d 626 (2004). See Neb. Rev. Stat. § 25-1148 (Reissue 2016). A motion for continuance is addressed to the discretion of the trial court, whose ruling will not be disturbed on appeal in the absence of an abuse of discretion. *Adrian v. Adrian,* 249 Neb. 53, 541 N.W.2d 388 (1995); *Velehradsky v. Velehradsky, supra*.

In addition to a party's compliance with § 25-1148, we are to consider three analytical factors when reviewing a trial court's denial of a motion for continuance: (1) the number of continuances granted to the moving party, (2) the importance of the issue presented in the matter, and (3) whether the continuance was being sought for a frivolous reason or a dilatory motive. *Weiss v. Weiss*, 260 Neb. 1015, 620 N.W.2d 744 (2001); *Velehradsky v. Velehradsky, supra*. We note that both of Anne's motions for continuance were in compliance with § 25-1148. Thus, we consider the three analytical factors with respect to each motion to continue.

*(i) First Motion to Continue Filed July 3, 2018*

Anne's first motion to continue was filed on July 3, 2018, sought to continue the trial set for August 7 because counsel would "be outside of the State of Nebraska from August 1, 2018[,] through August 10, 2018, and is not available for trial on August 7, 2018." The motion to continue the trial also alleged that counsel, who had just taken over the case, required time to complete discovery and that October 1 was available for a new trial date and that counsel could be ready for trial by that date.

Here, counsel accepted Anne's case with the knowledge that the case had already been set for trial. Further, the trial had been set for August 7, 2018, at least partially on the representations of Anne's former counsel who had "acknowledged to the Court at the time of the progression conference on May 14, 2018, that trial in the matter should be concluded prior to school resuming for the Fall 2018 semester." Although we acknowledge that Anne's counsel was not seeking to continue the trial for a frivolous or dilatory motive, Anne was bound by her counsel's previous representations to the court and the prejudice to Robert and Erin in continuing the trial exceeded that of Anne in her decision to choose new counsel. The district court did not abuse its discretion in denying Anne's first motion to continue the trial.

*(ii) Second Motion to Continue Filed August 1, 2018*

Anne's second motion to continue filed on August 1, 2018, sought to continue trial on the basis that the discovery process was not complete; that, during a July 17 telephonic hearing on her motion to continue the trial, counsel learned of Robert's intention to use the transcript of Huckins' deposition, whose deposition was set for that afternoon, in lieu of live testimony; counsel notified the court and defense counsel that she would not be appearing at Huckins' deposition on July 17 due to the improper notice of a deposition in lieu of live testimony and consequently, Anne was unrepresented at the deposition; and a continuance was necessary in order for Anne's counsel to conduct her own discovery of Huckins.

Here, the record reflects that on July 13, 2018, Anne's counsel was served notice by U.S. Mail of Huckins' deposition to be taken on July 17 at 1:30 p.m. at Huckins' office in Omaha. However, Anne's counsel chose not to appear for that deposition. By doing so, she created the issue relied upon for requesting the continuance of trial by failing to attend the deposition, i.e. that the discovery process was not complete. We cannot say that the district court erred in denying her motion to continue the trial based upon a situation of her own making.

### (c) Opportunity to Conduct Discovery

Anne also contends that the district court erred in failing to afford Anne's second counsel the opportunity to conduct discovery. We assume that Anne means that the court should have granted her counsel a continuance to provide her an opportunity to complete discovery. Anne argues:

> Upon the District Court's denial of [Anne]'s first motion to continue, which hearing was held on July 17, 2018, [Anne] served [Robert] with interrogatories and requests for production of documents. . . Although the 30-day period within which [Robert] had to provide his discovery responses would run after the August 7, 2018, trial date, [Anne] had no other choice but to at least attempt obtaining discovery in advance of trial. The District Court abused its discretion in failing to provide [Anne] the opportunity to complete discovery in order to fairly litigate the constitutionally-protected issue of custody of the parties' daughter.

Brief for appellant at 27-28.

The primary purpose of the discovery process is to explore all available and properly discoverable information to narrow the fact issues in controversy so that a trial may be an efficient and economical resolution of a dispute. *Eddy v. Builders Supply Co.*, 304 Neb. 804, 937 N.W.2d 198 (2020).

Here, Anne was on notice as of May 17, 2018, that the trial in this matter was set for August 7. Anne also had represented to the court through her former counsel "at the time of the progression conference on May 14, 2018, that trial in the matter should be concluded prior to school resuming for the Fall 2018 semester." Anne chose to hire new counsel 1 month prior to the start of a trial which she had represented to the court should be concluded prior to the start of Erin's fall semester. Although the time period from the time Anne's new counsel filed her entry of appearance to the schedule trial date was a little over 1 month, trial was scheduled prior to the time counsel accepted the case and, upon doing so, accepted the shorter time period to prepare for trial especially with Anne's prior representations to the court that trial should be completed prior to Erin beginning her Fall semester classes. Further, Anne testified that she first contacted her attorney in May 2018 and the attorney fee affidavit completed by Anne's attorney which was received into evidence showed that the first attorney and paralegal conference listed for Anne's case took place on May 3, 2018, which was 2 months prior to Anne's attorney entering her appearance in the case. Under these circumstances, we cannot say that the court's refusal to grant a continuance was an abuse of discretion. This assignment of error fails.

### 2. MATERIAL CHANGE OF CIRCUMSTANCES/BEST INTERESTS

Second, Anne contends that the district court erred in finding that a material change of circumstance occurred warranting Robert's physical custody of Erin and that changing custody was in Erin's best interests.

Prior to the modification of a child custody order, two steps of proof must be taken by the party seeking the modification. *Eric H. v. Ashley H.*, 302 Neb. 786, 925 N.W.2d 81 (2019). First, the party seeking modification must show a material change in circumstances, occurring after the entry of the previous custody order and affecting the best interests of the child. *Id*. Next, the party

seeking modification must prove that changing the child's custody is in the child's best interests. *Id*. A material change of circumstances constituting grounds for modification of a dissolution decree means the occurrence of something which, had it been known to the dissolution court at the time of the initial decree, would have persuaded the court to decree differently. *Id*.

Neb. Rev. Stat. § 43-2923(6) (Reissue 2016) provides:

In determining custody and parenting arrangements, the court shall consider the best interests of the minor child, which shall include, but not be limited to, consideration of . . . :

(a) The relationship of the minor child to each parent prior to the commencement of the action or any subsequent hearing;

(b) The desires and wishes of the minor child, if of an age of comprehension but regardless of chronological age, when such desires and wishes are based on sound reasoning;

(c) The general health, welfare, and social behavior of the minor child;

(d) Credible evidence of abuse inflicted on any family or household member . . . ; and

(e) Credible evidence of child abuse or neglect or domestic intimate partner abuse.

In applying this provision, the Nebraska Supreme Court has stated that while the wishes of a child are not controlling in the determination of custody, if a child is of sufficient age and has expressed an intelligent preference, the child's preference is entitled to consideration. *Vogel v. Vogel,* 262 Neb. 1030, 637 N.W.2d 611 (2002). See *Floerchinger v. Floerchinger*, 24 Neb. App. 120, 883 N.W.2d 419 (2016). The Supreme Court has also found that in cases where the minor child's preference was given significant consideration, the child was usually over 10 years of age. *Vogel v. Vogel, supra*. See *Floerchinger v. Floerchinger, supra*.

The Nebraska Supreme Court has held that other pertinent factors include the moral fitness of the child's parents, including sexual conduct; respective environments offered by each parent; the age, sex, and health of the child and parents; the effect on the child as a result of continuing or disrupting an existing relationship; the attitude and stability of each parent's character; and parental capacity to provide physical care and satisfy educational needs of the child. *Robb v. Robb*, 268 Neb. 694, 687 N.W.2d 195 (2004); *Berndt v. Berndt*, 25 Neb. App. 272, 904 N.W.2d 24 (2017).

The Nebraska Supreme Court recently stated:

We have repeatedly held that before the district court considers whether a change of custody is in the best interests of the children, it must first find that there has been a material change of circumstances that has occurred since the entry of the prior order. See, *Hopkins v. Hopkins*, 294 Neb. 417, 883 N.W.2d 363 (2016); *Hoschar v. Hoschar*, 220 Neb. 913, 374 N.W.2d 64 (1985), *disapproved on other grounds, Parker v. Parker*, 234 Neb. 167, 449 N.W.2d 553 (1989). See, also, *Schrag v. Spear*, 290 Neb. 98, 858 N.W.2d 865 (2015). Proof of a change of circumstances is not an optional element to a modification proceeding. Proof of a material change of circumstances is the threshold inquiry in a proceeding on a complaint to modify, see *id.*, because issues determined in the prior custody order are deemed res judicata in the absence of proof of new facts and circumstances, see *Rauch v. Rauch*, 256 Neb. 257, 590 N.W.2d 170 (1999). Furthermore, limiting custody changes to

material changes in circumstances avoids extensive and repetitive litigation and unnecessary, potentially harmful fluctuations in the child's life. 67A C.J.S. *Parent and Child* § 145 (2013). A custody order will not be modified absent proof of new facts and circumstances arising since it was entered. See *Rauch v. Rauch, supra*.

*Eric H. v. Ashley H.*, 302 Neb. at 799-800, 925 N.W.2d at 92.

Our previous decision in *State on behalf of Slingsby v. Slingsby*, 25 Neb. App. 239, 903 N.W.2d 491 (2017), wherein we considered another child's custodial preference resulting in a change in physical custody, is instructive. In *Slingsby*, we stated:

We now address the material change in circumstances and the best interests of the child. Like the district court, we find this case is similar to *Floerchinger v. Floerchinger*, 24 Neb. App. 120, 883 N.W.2d 419 (2016), with regard to both. In *Floerchinger,* this court affirmed a district court's modification of physical custody based upon a material change in circumstances stemming from a son's expressed desire to live with his father in Nebraska. The son had been living with his mother in Maine for almost 11 years; at the time of trial, he was 13 years old. In that case, the son testified that he preferred living in Nebraska due to the comfortable and relaxed environment at his father's house and because he enjoyed the interaction he had with his father. In Maine, among other things, the son stated he was "pestered" by his stepsiblings. *Id.* at 127, 883 N.W.2d at 426.

. . . In *Floerchinger,* the district court found a material change in circumstances had occurred subsequent to the decree which justified modification of custody and that such modification was in the best interests of the child. We noted, "The [district] court specifically focused on [the child's] desire to reside with [his father] in Nebraska, concluding that [the child] was articulate and that his decision was based on sound reasoning." *Id.*

. . . .

. . . In *Floerchinger,* the court considered a number of factors in its custody determination (e.g., child's age and preference, academic and social benefits, living environment, and general quality of life). Such factors go to the welfare of the child, and . . . such evidence can be considered in a change of custody determination. See, also, *Miles v. Miles*, 231 Neb. 782, 438 N.W.2d 139 (1989) (custody modification based on child's preference and deterioration of parent-child relationship).

Similar to *Floerchinger v. Floerchinger, supra,* the court in this case specifically found Hunter's stated preference to live with Devin and his evolving relationship with Devin constituted a material change in circumstances. Hunter clearly stated his reasons for wanting to live with Devin: He is interested in agriculture and likes to help Devin with cattle, he enjoys being outdoors and hunting, he likes being in a smaller town, and he has more friends in Ansley. Devin felt "trapped" at Jessie's house and did not "get out much." Hunter had also struggled in school for a number of years, particularly with regard to completing and turning in assignments; his grades ran the gamut from A's to F's, despite Jessie's and Christopher's efforts to help him. He had spoken to his friends from Ansley about their school experience and felt the high school in Ansley would be a better fit for him. In particular, Hunter was interested in an "ag class" offered at Ansley, the smaller

class sizes (which would provide more opportunity to work with teachers), and the study halls (which would help him to get his homework done during the day). After our de novo review of the record, we conclude the district court did not abuse its discretion in finding there had been a material change in circumstances.

Devin and Jessie presented conflicting testimony regarding whether a change in custody would be in Hunter's best interests, including whether Hunter's reasons for wanting to live with Devin were sound. In contested custody cases, where material issues of fact are in great dispute, the standard of review and the amount of deference granted to the trial judge, who heard and observed the witnesses testify, are often dispositive of whether the trial court's determination is affirmed or reversed on appeal. *Schrag v. Spear,* 290 Neb. 98, 858 N.W.2d 865 (2015); *Floerchinger v. Floerchinger, supra.* The trial court in this case had an opportunity to observe the testimony of both parties, as well as the testimony of Hunter and the other witnesses. The court found Hunter had "very clearly" given his reasons for wanting to live with Devin and that Hunter's stated preference outweighed the other factors for best interests. The court reached this conclusion while also acknowledging the "extraordinary efforts put forth" by Jessie and Christopher and that "their involvement remains essential to Hunter's best interests."

At the time of the modification hearing, Hunter was within weeks of turning 16 years old. As stated above, he clearly stated his reasons for wanting to live with Devin. Although Jessie calls Hunter's reasoning and maturity into question, the district court found Hunter's reasons were sound. Several of Jessie's witnesses testified that, aside from school work, Hunter is mature and responsible and that he has become more mature in the past year. In addition to Hunter's wishes, the district court had an opportunity to consider other best interests factors, including Hunter's academic performance, extracurricular activities, friends, living environment, and general qualities of life at both parents' respective homes. The court found both Devin and Jessie had positive qualities to offer Hunter, but that Hunter's stated preference outweighed the other factors. Upon our de novo review, we can find no abuse of discretion in the district court's decision to award physical custody of Hunter to Devin.

*State on behalf of Slingsby v. Slingsby*, 25 Neb. App. at 251-55, 903 N.W.2d at 499-502.

Similar to *Slingsby* and *Floerchinger*, in the instant case, the dynamics of both Anne and Robert's households have changed from the time of the court's November 2015 modification order. Both Robert and Anne have remarried since the November 2015 modification order which has changed the dynamics in each household, Anne relocated to Omaha, and these changes have had an effect on Erin. The record reflects that, after living in Omaha for nearly 3 years, Erin desires to be closer to her siblings in the Kearney area. Her brother has returned to the area after his discharge from the military and her sister and another brother have returned to the area after finishing higher education. Erin also likes being around her new stepbrother in Kearney. Erin compared her Omaha and Kearney homes on a scale of one (peaceful) to ten (chaotic) rating her Omaha home being a six where Anne and Michael were fighting and a three to four when they were not fighting. She rated her Kearney home as a one except when her sister comes over when she rated the home at a two or a three. Although Erin is still only 13 years old, she is described as

mature for her age. Erin's expressed reasons for wanting to move to Kearney included that she desired to move to Kearney to attend the school that her siblings attended, she would be closer to her siblings, and that Robert's home was more peaceful and communicative and that she could express herself without getting into trouble. Certainly Anne's move to Omaha and the parties' remarriages and family developments following these changes constitute matters not known to the court when the court fashioned the original decree and, although the court properly ruled in 2017 that Anne's desire to move was not sufficient in and of itself to constitute a material change of circumstances, the court was free to review developments subsequent to the move including, but not limited to, Anne's remarriage and other developments within the family. After our de novo review of the record, we can find no abuse of discretion in the district court's decision in finding that there had been a material change in circumstances.

Regarding best interests, the evidence shows that Erin has a good relationship with both Robert and Anne and both parents are actively involved in Erin's life, although Anne handles the majority of Erin's health-related issues. The evidence further reflects that both Anne and Robert love Erin and want what is best for her. Both Omaha and Kearney provide good educational opportunities for Erin, and that she had been successful academically, and been active in extracurricular activities, in both cities. Further, although Erin would be physically closer to her doctors in Omaha, she will be equally able maintain her medical care whether she resides in Omaha or Kearney. The evidence further reflects that Erin has made close friends in Omaha and that she has old friends in Kearney. Erin told numerous people that she has been considering whether she wanted to live in Kearney for several years. She further talked with Huckins about the issue and identified pros and cons for living in each city. Erin's stated reasons for wanting to move to Kearney to live with Robert as less fighting, being closer to her siblings, going to the school where her siblings attended, seeing her old friends, being in a family that communicates more, being in a more family setting, the family is not as strict, and she feels that she can express her opinion without getting in trouble. She listed the cons as being further from her doctors and further from her current friends. Erin listed the pros of staying in Omaha with Anne as being close to her doctors, keeping her friends, having more options for high schools, being in club volleyball, being in the same town as her grandma, and having a lot to do. She listed the cons as having a lot of consequences, more fighting, and disagreements at Anne's home; she was not as close to her siblings; and there was more crime in Omaha. We agree with Huckins' assessment that Erin's reasons for wanting to move to Kearney were rational and reasonable for a 13-year-old. We further acknowledge that Erin has apparently thought this matter through for an extended period of time and did not arrive at her decision either lightly or without sufficient consideration.

Further, the district court in this case had an opportunity to observe the testimony of both parties, as well as the Erin's testimony and the testimony of the other witnesses. In addition to Erin's wishes, the district court had an opportunity to consider other factors, including Erin's academic performance, extracurricular activities, friends, living environment, and general qualities of life at both parents' respective homes. Although both Anne and Robert are loving and fit capable parents, upon our de novo review, we can find no abuse of discretion in the district court's decision to award physical custody of Erin to Robert.

### 3. Decisionmaking Authority

Third, Anne contends that the district court erred in modifying final decisionmaking authority regarding Erin's medical decisions from Anne to Robert. She contends that Robert's original complaint, which was the operative pleading, did not request a modification of legal custody wherein he would be the sole determiner of appropriate medical care for Erin. She also contends that the district court did not receive any evidence that there was a material change in circumstances requiring such a change or that it would be in Erin's best interests to modify decisionmaking authority from herself to Robert.

We first note that the parties' original decree, as modified by a subsequent journal entry, provided that the parties were to share joint legal custody of Erin, but that Anne would be the sole determiner of any appropriate medical care necessary for Erin. We also note that Robert's current complaint for modification requested "such other and further relief as this Court deems equitable and just." Further, Neb. Rev. Stat. § 42-351(1) (Reissue 2016) provides, in pertinent part:

> In proceedings under sections 42-347 to 42-381, the court shall have jurisdiction to inquire into such matters, make such investigations, and render such judgments and make such orders, both temporary and final, as are appropriate concerning the status of the marriage, the custody and support of minor children, the support of either party, the settlement of the property rights of the parties, and the award of costs and attorney's fees.

The district court chose in the initial 2014 dissolution decree to award the parties joint legal custody of Erin but awarded Anne, the party with primary physical custody of Erin, the authority to be the sole determiner of any appropriate medical care necessary for Erin notwithstanding the joint legal custody arrangement.

Here, the court heard extensive testimony regarding Erin's best interests and determined that a material change in circumstances had occurred and that it was in Erin's best interests that physical custody of Erin be changed to Robert. In relation to the joint legal custody arrangement, just as the court originally tied final decisionmaking authority to Anne when she was awarded primary physical custody of Erin, it made sense and was in Erin's best interest to modify that final decisionmaking authority to Robert once primary physical custody of Erin had been awarded to him. We conclude that, having determined that the district court did not abuse its discretion in awarding Robert sole physical custody of Erin, the court likewise did not abuse its discretion in placing final decisionmaking authority, including medical treatment, with Robert.

### 4. Parenting Time

Fourth, Anne contends that the district court erred in awarding Anne the same amount of parenting time that was previously awarded to Robert.

In establishing Anne's parenting time schedule following the court's modification of sole physical custody of Erin from Anne to Robert, the court ordered that the parenting plan that had previously been in effect would now be reversed meaning Anne would now have Robert's parenting time and vice versa. Thus, pursuant to the district court's order, Anne has parenting time with Erin every other weekend, alternating holidays, all "extended recess[es]" from school including fall and spring break, and extended summer parenting time from the end of the school year until June 30. Although Anne testified that the parenting time should not be changed, once

the district court determined that primary physical custody of Erin was placed with Robert, the court was required to modify the parties' parenting time. Awarding Anne the same parenting time that was afforded to Robert when he was the noncustodial parent for several years and what has clearly produced a well-adjusted child who is the product of both of these loving parents can hardly be described as an abuse of discretion. This assignment of error fails.

### 5. ATTORNEY FEES

Anne's last assignment of error is that the district court erred in denying her request for attorney fees. She contends that Robert is a high earner, whereas she works part time, that she did not litigate this case in bad faith, she was required to defend against Robert's request for modification of custody, and she has occurred nearly $18,000 in litigating and defending against this modification and does not have the ability to pay her legal fees.

In addressing attorney fees in *Pearrow v. Pearrow*, 27 Neb. App. 209, 217, 928 N.W.2d 430, 437 (2019), this court stated:

> Attorney fees and expenses may be recovered only where provided for by statute or when a recognized and accepted uniform course of procedure has been to allow recovery of attorney fees. *Garza v. Garza,* 288 Neb. 213, 846 N.W.2d 626 (2014). Customarily, attorney fees are awarded only to prevailing parties or assessed against those who file frivolous suits. *Id.* A uniform course of procedure exists in Nebraska for the award of attorney fees in dissolution cases. *Id.* Thus, there was authority, in this modification of a dissolution decree case, for the awarding of attorney fees. See *id.*

> In awarding attorney fees in a dissolution action, a court shall consider the nature of the case, the amount involved in the controversy, the services actually performed, the results obtained, the length of time required for preparation and presentation of the case, the novelty and difficulty of the questions raised, and the customary charges of the bar for similar services. *Id.*

In the instant case, although Anne argues that Robert makes $100,000 per year, she has earned $60,000 per year when employed full time. At the time of the modification trial, Anne was choosing to work part time plus she had income from her condo and investments that she chose not to fully present to the court. The issues presented herein were not novel nor was Anne the prevailing party. Thus, we find no abuse of discretion in the court's decision to deny Anne's request for attorney fees.

### VI. CONCLUSION

Having considered and rejected Anne's assignments of error, we affirm the order of the district court.

AFFIRMED.